RECORD NO. 14-2158

In The

# United States Court of Appeals
### For The Fourth Circuit

## ERA L. CARTER, as Executor and Personal Representative of the Estate of Floyd C. Carter, Jr., Deceased,

*Plaintiff – Appellant,*

**v.**

## UNITED STATES OF AMERICA,

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT NEWPORT NEWS

_____

## BRIEF OF APPELLANT

_____

Robert T. Hall
Samantha K. Sledd
HALL & SETHI, PLC
12120 Sunset Hills Road, Suite 150
Reston, Virginia 20190
(703) 925-9500

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-2158__      Caption: __Carter v. United States__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Era L. Carter, as Executor and Personal Representative of the Estate of Floyd C. Carter, Jr., Deceased__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature:    /s/ Robert T. Hall    Date:    11/4/14

Counsel for:    Appellant Era L. Carter

## CERTIFICATE OF SERVICE
****************************

I certify that on    11/4/14    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Robert T. Hall
(signature)

11/4/14
(date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION ........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF CASE ...........................................................................3

    I.    PROCEDURAL HISTORY .................................................3

    II.    STATEMENT OF FACTS ...................................................5

SUMMARY OF ARGUMENT ..................................................................11

ARGUMENT ......................................................................................14

    I.    MR. HARRIS'S MISCONDUCT WAS WILLFULL AND
        WANTON AS A MATTER OF LAW .....................................14

        A.    Standard of Review ..............................................14

        B.    Analysis ...........................................................14

    II.    MR. CARTER'S CONDUCT DID NOT CONSTITUTE
        CONTRIBUTORY  NEGLIGENCE ......................................22

        A.    Standard of Review ..............................................22

        B.    Analysis ...........................................................22

    III.    MR. CARTER WAS NOT A PROXIMATE CAUSE OF THE
        COLLISION ...................................................................26

        A.    Standard of Review ..............................................26

B.    Analysis ................................................................................. 26

IV.   THE DISTRICT COURT ERRED WHEN IT CONSIDERED MR.
      CARTER'S CONTRIBUTORY NEGLIGENCE AS BEARING ON
      WHETHER MR. HARRIS ENGAGED IN WILLFUL AND
      WANTON MISCONDUCT ............................................................... 31

      A.    Standard of Review ........................................................... 31

      B.    Analysis ............................................................................. 31

CONCLUSION ...................................................................................... 33

REQUEST FOR ORAL ARGUMENT .................................................. 34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alfonso v. Robinson*,
      414 S.E.2d 615 (Va. 1999) .................................................................14, 15, 17

*Beverly Enterprises-Virginia*, *Inc. v. Nichols*,
      441 S.E.2d 1 (Va. 1994) ...............................................................................28

*Boward v. Leftwich*,
      89 S.E.2d 32 (Va. 1995) ...............................................................................17

*Cary v. United States*,
      343 Fed. Appx. 926 (4th Cir. 2009) ..................................................... 25-26

*Chandler v. National R.R. Passenger Corp.*,
      575 F. Supp. 1172 (E.D.Va. 1995) ..............................................................29

*Citizens Rapid Transit Co. v. O'Hara*,
      128 S.E.2d 270 (Va. 1962) ...........................................................................26

*Clohessy v. Weiler*,
      462 S.E.2d 94 (Va. 1995) .......................................................................21, 31

*Coleman v. Blankenship Oil Corp.*,
      267 S.E.2d 143 (Va. 1980) .....................................................................28, 29

*Crist v. Fitzgerald*,
      52 S.E.2d 145 (Va. 1970) .............................................................................26

*CSX Transp.*, *Inc. v. McBride*,
      131 S. Ct. 2630 (2011)..................................................................................27

*Famous Knitware Corp. v. Drug Fair*, *Inc.*,
      493 F.2d 251 (4th Cir. 1974) .................................................................22, 26

*Griffin v. Shively*,
   315 S.E.2d 210 (Va. 1984) ...........................................................17

*Harris v. Harman*,
   486 S.E.2d 99 (Va. 1997) ............................................................20

*Hicks v. United States*,
   368 F.2d 626 (4th Cir. 1966) ......................................................14

*Hot Shot Express v. Brooks*,
   563 S.E.2d 764 (Va. 2002) ..........................................................25

*Huffman v. Sorenson*,
   76 S.E.2d 183 (Va. 1953) ............................................................27

*Infant C. v. Boy Scouts of America, Inc.*,
   91 S.E.2d 332 (Va. 1990) ............................................................17

*Karim v. Grover*,
   369 S.E.2d 185 (Va. 1988) ..........................................................28

*Litchford v. Hancock*,
   352 S.E.2d 335 (Va. 1987) .....................................................23, 32

*Munday v. Waste Mgmt. of North America*,
   126 F.3d 239 (4th Cir. 1997) ......................................................14

*Rascher v. Friend*,
   689 S.E.2d 661 (Va. 2010) ..........................................................28

*Rawl v. United States*,
   778 F.2d 1009 (4th Cir. 1985) ......................................22, 26, 31

*Smith's Adm'r v. Norfolk & P. Traction Co.*,
   63 S.E. 1005 (Va. 1909) ..............................................................28

*Wagoner v. Com.*,
756 S.E.2d 165 (Va. Ct. App. 2014) ....................................................27, 29

*Wolfe v. Baube*,
403 S.E.2d 338 (Va. 1991) ...........................................................................17

## **STATUTES**

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1346 .................................................................................................3

28 U.S.C. § 1346(b) ............................................................................................1

28 U.S.C. § 2680 .................................................................................................1

Va. Code § 46.2-928 ........................................................................................21

Va. Code § 46.2-1040 .......................................................................11, 12, 16, 20

Va. Code § 46.2-888 ..................................................................................*passim*

Va. Code § 8.01-53 .............................................................................................1

## **RULES**

Fed. R. Civ. P. 52(a).....................................................................................22, 26

Fed. R. Civ. P. 52(a)(6).................................................................................14, 22

Va. Sup. Ct. R. 5:40 .........................................................................................30

## **OTHER AUTHORITY**

Charles E. Friend, Personal Injury Law In Virginia §4.1 (E).................................27

<u>**STATEMENT OF SUBJECT MATTER AND**</u>
<u>**APPELLATE JURISDICTION**</u>

Plaintiff Era L. Carter, as Executor and Personal Representative of the Estate of Floyd L. Carter, Jr., Deceased, filed this action pursuant to Virginia's Wrongful Death Act, Va. Code § 8.01-53. The United States District Court for the Eastern District of Virginia exercised subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b) and 28 U.S.C. § 2680 as this is a civil action for money damages against the United States of America.

On August 25, 2014, the United States District Court for the Eastern District of Virginia issued its order in favor of the United States after a trial on the merits. This constituted a final decision by the district court that ended the litigation and decided all claims brought forth by the parties. Plaintiff filed her Notice of Appeal with the district court on August 25, 2014.

The Court of Appeals for the Fourth Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291 which grants appellate review over final decisions by the district courts of the United States.

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

I.      Whether the District Court erred in its holding that the conduct of Eric Harris did not rise to willful and wanton negligence?

II.     Whether the District Court erred in its holding that Floyd Carter was contributorily negligent?

III.    Whether the District Court erred in its holding that Floyd Carter's contributory negligence was the proximate cause of his injuries?

IV.    Whether the District Court erred when it considered Floyd Carter's contributory negligence as bearing on whether Eric Harris engaged in willful and wanton misconduct?

## STATEMENT OF CASE

**I.     PROCEDURAL HISTORY.**

On August 21, 2013, Appellant-Plaintiff  Era L. Carter, as Executor and Personal Representative of the Estate of Floyd C. Carter, Jr., Deceased, filed her complaint against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 1346.  (J.A. 8-14.)  Plaintiff alleged that Mr. Eric Todd Harris, an employee of the Department of Navy, while on duty, caused the death of Mr. Floyd C. Carter, Jr. by operating his car in a willfully and wantonly negligent manner. (J.A. 8-14.)  Plaintiff sought compensatory damages for the statutory beneficiaries as follows:

   a.     sorrow, mental anguish and loss of solace including the loss of their loved one's society, companionship, comfort, guidance, kindly offices and advice;

   b.     loss of the reasonably expected income of Mr. Carter, as well as the loss of his services, protection, care and assistance;

   c.     expenses incurred for Mr. Carter's care, treatment and hospitalization incident to the injury which resulted in his death; and

   d.     reasonable funeral expenses incurred.

(J.A. 13-14.)   On October 28, 2013, the United States of America, the Appellee-Defendant, answered the complaint.  (J.A. 15-22.)

On June 23, 2014, after the completion of discovery, the United States filed its Motion for Summary Judgment.  The United States contended that summary judgment should be granted because by law Eric Harris did not operate his vehicle in a willful and wanton manner, and that Floyd Carter contributed to his death by negligently operating his vehicle.  On July 7, 2014, Plaintiff filed her opposition and cross-motion for partial summary judgment contending that Eric Harris operated his vehicle in a willful and wanton manner as a matter of law.  The District Court denied both motions for summary judgment on August 8, 2014.

Trial commenced on August 12, 2014, and concluded on August 14, 2014.  (J.A. 62-502.)  On August 25, 2014, the District Court found that the conduct of Eric Harris, though grossly negligent, did not rise to the level of willful and wanton negligence, and that Floyd Carter's contributory negligence was a proximate cause of the accident.  (J.A. 986-987.)  Therefore, Virginia law barred Plaintiff from any recovery.  (J.A. 986-987.)

On August 25, 2014, Plaintiff filed her Notice of Appeal with the District Court stating her intent to appeal the District Court's order in favor of the Appellee.  (J.A. 990-991.)  Appellant docketed this appeal in the Court of Appeals on October 27, 2014.   On November 5, 2014, this Court issued its briefing order.

4

## II.    STATEMENT OF FACTS.

Mr. Eric Todd Harris was a civilian employee for the Department of Navy, and scheduled to catch a 5:30 a.m. flight from the Newport News/Williamsburg International Airport on Navy business the morning of August 17, 2012. (J.A. 948.) At approximately 4:00 a.m., Mr. Harris proceeded to the airport from his home in Hampton in his 2003 BMW 525i via Interstate 64 West ("I-64W"). *Id*. His customary route to the airport required him to take the Jefferson Avenue exit, Exit 255. *Id*. He had driven this route and taken this exit approximately 30-40 times previously. (J.A. 107.)

I-64W between the Oyster Point entrance and the Jefferson Avenue exit is roughly straight and level. (J.A. 949.) At the time of this collision, the posted speed limit was 60 miles per hour. (J.A. 948.) That morning the Jefferson Avenue exit and its collector lanes were closed due to construction. (J.A. 948.) To warn motorists of the closure, the Virginia Department of Transportation ("VDOT") had issued public notices about construction on the Jefferson Avenue exit from July 22, 2012 through August 24, 2012. (J.A. 948.)

Starting at least a mile and a half before the Jefferson Avenue exit, motorists were alerted and warned by numerous traffic signs posted along the highway about the closure of Jefferson Avenue Exit 255, and that a detour had been put in place. (J.A. 948-949.) At least one large overhead message board centered above I-64W

5

displayed the warning.  (J.A. 949.)  An electronic arrow board located prior to the

Jefferson Avenue exit displayed a giant flashing arrow pointing left.  *Id*.

Additionally, the following non-electronic signs were placed in advance of the

construction area: (1) two roadwork ahead signs, (2) two right lane closed signs,

(3) a lanes merge left sign, (4) a keep left sign, (5) two merge left symbol signs, (6)

an exit closed sign, (7) a detour ahead sign, (8) and a detour straight sign.  *Id*.  All

the non-electronic signs were made of VDOT 3 honeycomb reflective plastic.  *Id*.

Detour signs located on I-64W alerted motorist to use Exit 250 instead.  (J.A. 188-

189.)

        Approximately 200 2½ feet tall reflective orange traffic cones and 30

reflective orange traffic barrels ran along the white lines dividing the travel lanes

and the exit's collector lanes and into the gore area where they stopped ahead of a

collapsible guardrail.  *Id*.  The guardrail connected to a jersey wall that divided the

remainder of the collector lanes from the travel lanes.  (J.A. 947.)  A crash truck

and a Virginia State Police vehicle, with its overhead lights activated, were located

near the beginning of the collector lanes for the Jefferson Avenue exit.  (J.A. 949.)

The speed limit on I-64W at the Jefferson Avenue exit remained 60 miles per hour

because the construction was confined to the exit lanes.  (J.A. 948.)

        Despite driving past all the aforementioned construction signs, Mr. Harris

slowed and then stopped his car in the right travel lane, not because of an

emergency, accident or mechanical breakdown as identified in Va. Code § 46.2-888, but to look for a makeshift passage onto the Jefferson Avenue exit.  (J.A. 111-113, 950.)  When he could not find a makeshift passage, he decided to stop his car in the right travel lane while he attempted to persuade two construction workers to allow him to use the Jefferson Avenue exit despite its closure.  (J.A. 953.)  He brought his car to a complete stop about three quarters of a mile from the end of the Oyster Point entrance ramp feeder lanes and about 2,100 feet from the start of the Jefferson Avenue exit collector lanes.  (J.A. 950.)  Mr. Harris could have pulled his car on to the shoulder 77 feet away.  (J.A. 950, 582, 584, 211-212.)  He stopped his car in violation of Virginia Code § 46.2-888.  (J.A. 950.)

Mr. Harris knew stopping on the interstate was dangerous, and had he seen any lights coming up behind him he would not have stopped because it would have been hazardous to himself and the occupants of the following car.  (J.A. 126-127, 952-953.)  When he initially stopped, he saw no lights behind him.  (J.A. 952-953.)  While stopped, he had an unobstructed rear view nearly back to the Oyster Point entrance ramp.  (J.A. 952.)  Tragically, he failed to continue monitoring the roadway behind him because he was busy trying to negotiate use of the closed exit.  *Id*.

In addition to failing to keep any lookout to his rear once stopped, Mr. Harris also elected not to engage his emergency flashers or undertake any other

method to warn motorist behind him of the hazard he admittedly created.  (J.A. 950.)  While Mr. Harris's brake lights were illuminated, an approaching driver would not have noticed the difference between the normal taillights and the brighter brake taillights unless he had observed Mr. Harris braking to a stop.  (J.A. 955.)

Construction workers Esmar Henderson and John Hatley were working on the Jefferson Avenue exit on the morning of August 17.  (J.A. 157-158, 183.)  Mr. Hatley was the safety supervisor on the job site.  (J.A. 181-183.)  Mr. Hatley and Mr. Henderson were working adjacent to the gore area, near the jersey wall when Mr. Harris stopped to talk with them.  (J.A. 954.)  Mr. Henderson was standing near the rear of a box truck parked in the collector lanes of the exit, and Mr. Hatley was in the cab of the box truck.  *Id.*  Both workers wore retro-reflective vests and pants designed to be reflective and visible for ¼ mile.  *Id.*

In an effort to make his 5:30 a.m. flight, Mr. Harris obstructed the highway in an effort to "ask the right questions" of the construction workers and gain passage through the closed exit that was clearly marked as such.  (J.A. 115, 953.)

Upon noticing Mr. Harris's stopped vehicle, Mr. Henderson shouted at Mr. Harris that the exit was closed and that he needed to move his vehicle.  (J.A. 953.)  He emphasized these directions by waving his arms forward so as to instruct Mr. Harris to move his vehicle.  (J.A. 953.)  Mr. Harris understood Mr. Henderson's

warning, but instead of moving on, he selfishly continued trying to convince Mr.

Henderson to let him through the closed exit because he was in a hurry.  (J.A. 116-

118.)  Mr. Hatley heard Mr. Henderson issue these directions in a voice loud

enough for Mr. Harris to hear, and heard Mr. Harris say that his GPS told him to

take this exit, so that was the exit he was taking.  (J.A. 189-190.)  Mr. Harris, of

course, did not need his GPS to get to the airport because he had travelled this

route many times before.  (J.A. 126.)  Mr. Harris was trying to con the workers into

granting him access to the closed exit.  When Mr. Hatley saw no indication that

Mr. Harris intended to move, he exited his truck to address the "big" safety hazard

of the vehicle being "stopped in the middle of the Interstate."  (J.A. 191.)

Mr. Carter, driving his 2003 Hyundai Elantra, had entered I-64W at Oyster

Point and was proceeding westbound in the right travel lane.  (J.A. 950, 956.)  He

was heading to his civilian job at the Navy Weapons Station further west off  I-64,

where at age 80, he was to open the base gymnasium and serve as a personal

trainer.  (J.A. 254.)  He had gone to work the day before when this exit was also

closed due to this construction.  (J.A. 259, 184-185.)  All of the construction was in

the exit lanes; no work was being done on the through lanes and no construction

traffic used the through lanes, only the ramps.  (J.A. 184.)  However, on this

morning, Mr. Carter encountered the unexpected, a fully stopped vehicle in a

through lane of travel. (J.A. 950.)  Consequently, Mr. Carter's vehicle collided

with the rear of the Harris vehicle, and Mr. Carter sustained injuries that resulted in his death four days later. (J.A. 804-806, 950, 957.)

While his injuries and death precluded Mr. Carter from testifying as to what he observed and when, Mr. Hatley testified that he appeared to be driving at "regular speed." (J.A. 175.) Gouge marks in the pavement of I-64W were made in the right hand through lane when the front of the Carter vehicle, which had dipped due to braking, engaged in an under-ride impact with the Harris vehicle. (J.A. 287-288, 855.) Post-impact distribution of debris indicated the Carter car deflected in the direction of the shoulder, where it hit the jersey wall, and came to a stop next to the wall. (J.A. 584, 596-602.) The damage to both vehicles suggested that the impact speed had been under the speed limit. (J.A. 287-288, 301-303.) Mr. Harris's car came to rest approximately 77 feet after the point of impact, and Mr. Carter's car came to rest approximately 100 feet after the point of impact. (J.A. 950.)

As a result of the collision, Mr. Harris was charged with, and subsequently pled guilty to, improper stopping on a highway in violation of Va. Code § 46.2-888. (J.A. 720, 950.)

10

## SUMMARY OF ARGUMENT

In short, Defendant's agent, running tight on time to catch his 5:30 a.m. flight, encountered numerous highway signs advising him that his intended exit was closed and that he would have to take a detour instead of his planned exit. Rather than undergo the inconvenience of the posted highway signs, when he arrived at that exit, he decided he would look for a way to slip through that closed exit. When he saw no such opportunity, he thought he would try to talk his way through that exit on the pretext that he needed to follow his GPS, which was telling him to proceed that way.

When he brought his car to a stop in the travel lane of the interstate highway, he obstructed the travel lane and rendered it dangerous in violation of Va. Code § 46.2-888, for which he was charged and pled guilty. Once stopped, he elected not to turn on his flashing hazard lights, as mandated by Va. Code § 46.2-1040, an omission which the trial court noted was "an exceedingly simple action that very likely would have saved Mr. Carter's life." (J.A. 947.) As he acknowledged in his testimony, Mr. Harris looked in his rear view mirrors before stopping. If there had been a car coming behind him he would not have stopped because to do so would have put both he and the occupants of the trailing car in danger. Then, after stopping, and without activating his hazard lights, he stopped looking in his rearview mirrors while he attempted to negotiate passage through the closed exit.

11

During the negotiations he failed to follow the directions of the road workers that he keep going, that he was not to stop there.  While Mr. Harris was engaged in this selfish mission (as the trial court described it), Mr. Carter, as he had done the day before, entered I-64W headed to his place of employment and encountered the unexpected and unforeseeable car stopped in the through lane, with predictable results.

The trial court erred in concluding that Mr. Harris had not been willful and wanton in disregard of his legal duties on the ground that he had no reason to believe that his conduct might probably result in harm.

Once the trial court so erred, it turned its attention to the United States' contention that Mr. Carter had been contributorily negligent.  In so holding, the trial court further erred because it imposed a duty of lookout on Plaintiff's Decedent which had no basis in Virginia law.

Finally, the trial court erred in holding that if Mr. Carter was contributorily negligent for failing to keep a proper lookout, that failure was a proximate contributing cause of the collision.  Here, the trial court failed to address and apply the time-honored distinctions between cause in fact and cause in law, or proximate cause.  On this issue, Plaintiff's point is irrefutable.  Va. Code § 46.2-1040 obligated Mr. Harris to activate his emergency flashers when temporarily stopped on the highway.  Mr. Harris did not, and the Court found that such "an exceedingly

simple action" would have very likely "saved Mr. Carter's life." (J.A. 947.)

Under these circumstances and this holding, Mr. Carter's failure to keep the

lookout, which the Court has constructed, was a remote, not a proximate cause of

his death.

## ARGUMENT

## I.    MR. HARRIS'S MISCONDUCT WAS WILLFUL AND WANTON AS A MATTER OF LAW.

### A.    Standard of Review.

Federal Rule 52(a)(6) of the Federal Rules of Civil Procedure provides that a trial judge's findings of fact should not be disturbed unless clearly erroneous. However, when the findings are based on undisputed facts, "the ultimate conclusion to be drawn from the basic facts, i.e., the existence or absence of negligence, is actually a question of law" and "is freely reviewable on appeal" de novo. *Hicks v. United States*, 368 F.2d 626, 630-31 (4th Cir. 1966); see also *Munday v. Waste Mgmt. of North America*, 126 F.3d 239, 241 (4th Cir. 1997).

### B.    Analysis.

The Virginia Supreme Court addressed collisions such as this in its 1999 case of *Alfonso v. Robinson*, 414 S.E.2d 615 (Va. 1999).  In *Alfonso*, a professional truck driver's truck stalled on Interstate 95 around midnight.  Because of a mechanical problem, the driver could only get the truck into the right-hand travel lane before stopping.  He left the truck to go call his employer from a rest area to arrange for a tow.  The driver did not turn on his emergency flashers, and did not set up any road flares or reflective triangles to warn approaching motorist.  Instead, he left his truck with only the running lights on.  While the driver was at the rest stop, another motorist rear-ended his truck.  The driver of the trailing vehicle had

14

seen the truck ahead, but was unable to stop her car once she determined the truck was stopped.  *Id*. at 617.

In *Alfonso*, the question was whether or not the failure of a truck driver to put out the orange, reflective triangles mandated by the Federal Motor Carrier Act created a jury question on willful and wanton misconduct.  *Id*. at 618-19.  The Virginia Supreme Court concluded that the driver's failure to warn that his truck was stopped under the circumstances was sufficient to raise a jury question of willful and wanton misconduct.

The critical distinction between *Alfonso* and the case at bar is that the *Alfonso* defendant did not create the hazard by electively obstructing the highway, he merely failed to warn that he had done so.  He had not violated Va. Code § 46.2-888 as Mr. Harris did.  Here, Mr. Harris voluntarily and electively stopped his car on the highway so as to obstruct safe passage and render the road dangerous.

As the *Alfonso* case relates, "[e]ach case raising an issue of willful and wanton negligence must be evaluated on its own facts, <u>and a defendant's entire conduct must be considered</u> in determining whether his actions or omissions present such a question for a jury's determination."  514 S.E.2d at 618 (emphasis added).

15

Mr. Harris's conduct involved serial failures to meet his legal duties as follows:

1.  He failed to observe and adhere to the multitude of exit closure and detour signs.

2.  He violated two motor vehicle safety statutes, stopping on a highway absent an emergency and failing to engage his hazard lights when stopped on a highway.  Va. Code § 46.2-888; Va. Code § 46.2-1040.

3.  He failed to keep a proper lookout for cars approaching from behind while illegally stopped.

4.  He failed to heed the construction workers warnings to keep moving.

Nevertheless, the District Court concluded that Mr. Harris lacked the requisite mindset for willful and wanton negligence.  In so doing, it stated:

[B]ecause Plaintiff fails to demonstrate that Mr. Harris was aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another, his grossly negligent conduct does not rise to the level of willful and wanton negligence.

(J.A. 980) (internal citations omitted).   However, the facts demonstrate that Mr. Harris had either actual knowledge or constructive knowledge that his actions would cause injury to another; therefore, the Court should have found him willfully and wantonly negligent as a matter of law.

16

Virginia law defines willful and wanton negligence as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Griffin v. Shively*, 315 S.E.2d 210, 213 (Va. 1984). The knowledge that his conduct would probably cause injury to another may be actual or constructive knowledge. *Alfonso*, 514 S.E.2d at 618 (citing *Infant C. v. Boy Scouts of America, Inc.*, 391 S.E.2d 322, 327 (Va. 1990); see also *Wolfe v. Baube*, 403 S.E.2d 338, 339-40 (Va. 1991); *Boward v. Leftwich*, 89 S.E.2d 32, 35 (Va. 1955).

Mr. Harris had both actual and constructive knowledge that his actions were likely to cause injury to another motorist. Before stopping, Mr. Harris checked his rearview mirrors to see if there were lights of any cars behind him because he was aware of the hazard to himself and to the occupants of the following car if he stopped with a car coming. (J.A. 126.) At trial he stated, "I think people could potentially be hurt as well as people could be killed as well." (J.A. 127.) He further indicated that if he had seen lights he would not have stopped because of that hazard. He testified that "I wouldn't want to place myself or anybody else in danger or harm's way." *Id.*

Whether Mr. Harris saw no lights when he first brought his car to a stop does not end the inquiry. Mr. Harris had clear vision rearward, all of the way back

17

to Oyster Point, three quarters of a mile away, the place where Mr. Carter likely entered the interstate. (J.A. 25, 129-130, 950.) If he had seen lights back there he would not have stopped. Therefore, Mr. Harris had constructive knowledge that if another driver entered the highway while he was stopped, it could overtake him while he was stopped in the travel lane of the interstate highway and pose the same danger or hazard as one he might see while looking. A reasonably prudent driver should know that interstates are major thoroughfares and people are constantly entering and exiting on and off them at all times of day or night. Therefore, a person who stops in a travel lane, without warning, on an interstate highway should know he poses an immediate danger to others.

The cumulative effect of Mr. Harris's choices was as follows:

1. He disregarded multiple highway signs advising him that his desired exit was closed.

2. Despite that, he stopped for selfish reasons related only to his convenience.

3. When he did so, he obstructed the travel lane of a major interstate highway and rendered it dangerous

4. Having created the hazard, he then failed to warn he had done so.

5. Having created the hazard, he failed to keep a proper lookout for traffic approaching from the rear which would raise the hazard and danger from potential to actual.

6. Directed not to stop by the construction personnel he neither looked nor moved from his lane of travel.

The trial court held that Plaintiff had not met her burden of demonstrating "that Mr. Harris was aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." (J.A. 980.) To reach this conclusion, the trial court observed that traffic was light and that Mr. Harris was only stopped for 25 seconds. (J.A. 951-952.) Interestingly, Mr. Harris's best estimate was that 45 seconds to a minute passed after he brought his car to a stop (J.A. 123-124), but the Court elected to disregard the time estimate of the person most knowledgeable of the time, and adopted 25 seconds as controlling while commenting that "[t]his Court would likely have reached a different conclusion if Mr. Harris had been stopped for a substantially longer period of time without monitoring his rear-view mirror." (J.A. 971.) Since the Oyster Point entrance ramp was three quarters of a mile away, traffic entering at Oyster Point at the speed limit of 60 miles per hour would arrive at the point of collision in 45 seconds and its headlights would have been visible all the way. Neither the prohibition of Va. Code § 46.2-888 (stopping so as to obstruct the highway) or the

mandate of Va. Code § 46.2-1040 (activation of emergency flashers) carve out "short time" exemptions from their provisions. Nor does Va. Code § 46.2-888 provide for a "light traffic" exception.

In any event, even if Mr. Harris's stop was only 25 seconds, during the 25 seconds Mr. Harris was stationary, he failed to keep a proper lookout for approaching drivers. While stopped Mr. Harris had an unobstructed view behind him to the highway's Oyster Point entrance, a stipulated three-quarters of a mile away. Knowing that his presence presented a danger to any oncoming traffic, Mr. Harris owed a duty to check behind himself often, especially when violating two statutes that exist to prevent the type of accident that occurred in this case.[1] See generally *Harris v. Harman*, 486 S.E.2d 99, 102 (Va. 1997) ("[e]very time a driver intentionally violates a traffic law, by definition the violator is on notice that other users of the road may be injured as a result of his violation"). Mr. Harris should have known, and would have known with slight diligence, that by intentionally and consciously disobeying vehicle safety laws, he created a serious hazard to others and had the duty to keep a proper lookout to protect others from the hazard he

---

[1]    Mr. Harris testified that he did not recall noticing any of the numerous signs and warnings about the Jefferson Avenue exit's closure. Given the sheer number of signs and warnings, this is further evidence of Mr. Harris's obliviousness and indifference to his duty to keep a proper look out for the safety of himself and other motorists on the highway.

created.  Thus, a person with reasonable vigilance would have noticed Mr. Carter's car approaching and would have acted prudently.

The District Court compared the present case with *Clohessy v. Weiler* in finding Mr. Harris's conduct not willful and wanton.  462 S.E.2d 94 (Va. 1995).  In *Clohessy*, a teenage driver struck the plaintiffs who were walking in the street with their backs towards traffic.  The defendant was driving with a fogged windshield and without her headlights at night.  The *Clohessy* Court found that the defendant did not have actual or constructive knowledge that pedestrians would be walking on the street with their backs to traffic, in violation of Va. Code § 46.2-928, at that time of night.  *Id*. at 97.  Therefore, the Court held that the defendant did not have knowledge of specific conditions that her actions were likely to injure others and thus, was not willfully and wantonly negligent.  *Id*.

However, in this case, Mr. Harris knew if there was a vehicle approaching from his rear it put him and the occupants of the following car at risk of injury or death, and was sufficiently cognizant of that risk that he looked in his rearview mirror to make certain that there was no one coming before he stopped.  Then, inexplicably, he stopped checking his mirror despite the fact that he was stopped in the travel lane of an interstate highway with a speed limit of 60 mph.  He did so without turning on his emergency flashers or hazard lights, an act the Court acknowledges would most likely have saved Mr. Carter's death.  Had Mr. Harris

looked in his rearview mirrors and observed Mr. Carter's approach, this incident

could have been avoided. If Mr. Harris had no actual knowledge that the Carter

car was approaching from his rear, it was because of his failure to keep a proper

and necessary lookout, an inculpatory act which the trial court construes in an

exculpatory way, treating his failure to keep a proper lookout as exonerating him

from willful and wanton behavior.

## II.    MR. CARTER'S CONDUCT DID NOT CONSTITUTE CONTRIBUTORY NEGLIGENCE.

### A.    Standard of Review.

Where presented with disputed facts on the issue, a district court's findings

of fact on the issue of negligence are generally reviewed under the "clearly

erroneous" standard of Fed. R. Civ. P. 52(a). <u>See</u> *Famous Knitware Corp. v. Drug*

*Fair, Inc.*, 493 F.2d 251, 253 n.2 (4th Cir. 1974). Rule 52(a)(6) provides that a

trial judge's findings of fact should not be disturbed unless clearly erroneous.

However, legal questions are reviewed de novo. *Rawl v. United States*, 778 F.2d

1009, 1014 (4th Cir. 1985).

### B.    Analysis.

The trial court clearly erred in finding that Mr. Carter breached any duty of

care. The Court found Mr. Carter negligent for failing to keep a proper lookout.

However, the Court imposed on Plaintiff's Decedent a duty to keep a form of

lookout not required by statue or case law, a question of law to be reviewed by this Court.

Under Virginia law, "[t]he driver of a motor vehicle has a duty to use ordinary care to maintain a proper lookout, and to keep his vehicle under proper control," and if he "fails to perform either of these duties, he is negligent." *Litchford v. Hancock*, 352 S.E.2d 335, 336-337 (Va. 1987) (internal citations omitted). In discharging such duties, "a driver is required to use ordinary care to observe other vehicles on the highway, <u>to see what a reasonable person would have seen</u>, and to react as a reasonable person would have reacted under the circumstances to avoid a collision." *Id*. (emphasis added). The United States had the burden to prove this element by preponderance of the evidence. *Id*.

The evidence was uncontradicted that drivers of trailing vehicles have extreme difficulty detecting and appreciating closing rates between the trailing vehicle and the lead vehicle as the former approaches the latter. Plaintiff's expert, Dr. Robert Pachella, set the scientific standard, the "subtended angular velocity", i.e. the rate at which the forward vehicle's image grows on the retina of the following driver. Stated in simple terms, the retinal image will double from its initial image size after the trailing car halves its distance to the leading car. The image size doubling will continue with each halving of distance. (J.A. 317-323.)

The United States' expert, Dr. William Vigilante, confirmed the subtended angular velocity variable as valid science. (J.A. 383, 407-408.) Based on the subtended angular effect, Dr. Pachella concluded that Mr. Carter likely could see Mr. Harris's brake lights from as far as 2,100 feet away, but Mr. Carter would not have been able to appreciate the fact that Mr. Harris was stopped and that he was rapidly closing in on him until approximately 300 feet away. (J.A. 327-328.)

The United States' expert witness, while conceding the scientific validity of these observations, further contended that where there are "external visual cues" that the lead vehicle is stopped, the trailing driver may determine that the lead car is stopped. (J.A. 381-383.) However, the external cues here consisted of fixed off-road items which would ordinarily have no bearing upon or be involved with the trailing driver's exercise of an otherwise proper lookout.

The defense expert contended, and the trial court accepted, that the driver of the trailing car owed a duty to observe the lead car's motion with respect to the following fixed, off-road items, and to use them to assess the rate at which the lead car's position was changing, or not changing: (1) the reflective VDOT uniform worn by Mr. Henderson, (2) the various illuminated lights on the stationary box truck adjacent to Mr. Harris's car, (3) the stationary reflective cones and barrels lining the right travel lane, (4) the stationary gore area, collapsible barrier and

jersey wall, (5) the stationary reflective "chevron" sign and exit sign, and (6) numerous street lights lighting the area.  (J.A. 963-964.)

However, when does a "cue" become a cue?  None of the objects identified above have any independent bearing on the driving plans and intentions of the driver of the trailing car.  None of the objects are in his travel lane or have any obvious bearing on his driving choices.  In other words, in the Court's view, to keep a proper lookout, a trailing driver must divert his gaze from the roadway ahead and assess the presence of fixed objects, of no independent importance to him, off the roadway to determine if they might constitute cues as to the speed, or lack of it, of another vehicle in his right of way.  No Virginia statute regulating traffic requires this and no Virginia case so holds this technique as a component of a proper lookout.

Mr. Carter was driving in compliance of the posted speed limit of 60 mph, and absent evidence to the contrary, is presumed to have acted with due care.  *Hot Shot Express v. Brooks*, 563 S.E.2d 764, 769 (Va. 2002).  Having traveled this route the day before and observed that the construction was exclusively in the exit lanes, and that the speed limit had not been decreased to accommodate the construction in any way, Mr. Carter had no reason to anticipate that a car would be stopped in his lane of travel.  In fact, he had the right to presume that other drivers would exercise ordinary care on the road, *Cary v. United States*, 343 Fed. Appx.

926, 929 (4th Cir. 2009) ("driver is entitled to presume that other drivers will obey the law and exercise reasonable care to avoid collisions") (citing *Citizens Rapid Transit Co. v. O'Hara*, 128 S.E.2d 270, 272-73 (Va. 1962)).  Moreover, he had the right to presume that no vehicle would be parked on the highway in front of him. *Crist v. Fitzgerald*, 52 S.E.2d 145, 149 (Va. 1949).  Therefore, Mr. Carter's actions were reasonable and did not constitute contributory negligence.

## III.    MR. CARTER WAS NOT A PROXIMATE CAUSE OF THE COLLISION.

### A.    Standard of Review.

Where presented with disputed facts on the issue, a district court's findings of fact on the issue of negligence are generally reviewed under the "clearly erroneous" standard of Fed. R. Civ. P. 52(a).  <u>See</u> *Famous Knitware Corp.*, 493 F.2d at 253 n.2.  However, under the facts of this case and the holding of the trial court with respect to the factual and legal consequences of Mr. Harris's failure to activate his emergency flashers, whether Mr. Carter's driving was a proximate cause of the collision is a matter of law for this Court to review de novo.  <u>See</u> *Rawl* 778 F.2d at 1014.

### B.    Analysis.

Even if Mr. Carter was negligent in failing to appreciate that Mr. Harris's car was stopped, the Court was wrong to conclude that Mr. Carter's negligence was a

proximate cause of his injuries.  In doing, the Court failed to appreciate the long-

recognized distinctions between cause in fact and proximate cause:

> Notwithstanding any factual connection between the…act and the…injury, an act or omission is not the proximate cause of an injury unless the injury    was foreseeable…Only if the result 'could reasonably have been anticipated        by a prudent man, in the light of attendant circumstances' is the…act the    proximate cause of the…injury.

Friend, Personal Injury Law in Virginia, Third Edition § 4.1(E) (quoting *Huffman*

*v. Sorenson*, 76 S.E.2d 183, 187 (Va. 1953)).

While it may appear axiomatic that in every case in which a following car

collides with the rear of the car ahead, the rearward car is a cause in fact of every

such collision, it is equally axiomatic that when the aft car runs into the rear of the

forward car, the proximate cause of that collision remains to be determined on the

specific facts of the case.  As the Virginia Court of Appeals has observed, "the

phrase 'proximate cause' is shorthand for the policy-based judgment that not all

factual causes contributing to an injury should be legally cognizable causes."

*Wagoner v. Com.*, 756 S.E.2d 165, 175 (Va. Ct. App. 2014) (citing *CSX Transp.*,

*Inc. v. McBride*, 131 S. Ct. 2630, 2642 (2011)).

The Virginia Supreme Court's position has long been that the law imposes

the same degree of care upon both the plaintiff and defendant, and if one party is

more negligent than the other, the law will not undertake to balance the negligence

of the respective parties for the purpose of determining which was more at fault.

*Smith's Adm'r v. Norfolk & P. Traction Co.*, 63 S.E. 1005, 1006-10007 (Va. 1909)

("There is no distinction between negligence in the plaintiff and negligence in the

defendant, except that the negligence of the former is called contributory

negligence").  However, before a party can be found contributorily negligent, a

court must determine if the plaintiff was a proximate cause of the collision.  *Karim*

*v. Grover*, 369 S.E.2d 185, 186 (Va. 1988) (stating that contributory negligence is

composed of the independent elements of negligence and proximate cause).

The proximate cause of an event is that "act or omission which, in natural

and continuous sequence, unbroken by an efficient intervening cause, produces the

event, and without which that event would <u>not</u> have occurred."  *Beverly*

*Enterprises-Virginia*, *Inc. v. Nichols*, 441 S.E.2d 1, 4 (Va. 1994) (quoting *Coleman*

*v. Blankenship Oil Corp.*, 267 S.E.2d 143, 147 (Va. 1980)).  To find proximate

cause, the plaintiff's negligence must be "a direct and efficient contributing cause

of the accident."  *Id*.  Therefore, when a defendant relies on the defense of

contributory negligence, he has the burden by proving by the preponderance of the

evidence that the plaintiff was a direct and efficient contributing cause of the

accident.  *Id*.

It is possible for a party to maintain a proper look out and not be the

proximate cause of an accident.  <u>See</u> *Rascher v. Friend*, 689 S.E.2d 661 (Va. 2010)

(holding that a cyclist was not negligent as a matter of law for failing to maintain

visual contact with other vehicles while entering an intersection); *Coleman*, 267

S.E.2d 143 (holding it was reasonable for a jury to conclude that the plaintiff could

reasonably overlook the oil slick in the road created by the defendant); *Chandler v.*

*National R.R. Passenger Corp.*, 575 F. Supp. 1172, 1180 (E.D. Va. 1995) (finding

that the plaintiff was not contributorily negligent as a matter of law because

whether the plaintiff stopped and listened for the approaching train would be

irrelevant if he was warned of the train only seconds before impact).

Even if Mr. Carter maintained an exceptional vigil, the accident was

proximately caused because Mr. Carter was not adequately warned of the hazard

posed by Mr. Harris's car.  As clearly stated by the Court, the use of four-way

flashers would "very likely" have saved Mr. Carter's life.  (J.A. 947.)  If Mr. Harris

would have taken a few seconds to turn on his emergency flashers, this accident

most likely does not occur.  Therefore, Mr. Harris's failure to engage his

emergency hazard lights and failure to warn constituted the sole proximate cause

of the accident.  Yet, despite the Court's recognition of this fact, it still incorrectly

found that Mr. Carter's inability to appreciate the danger until it was too late

nevertheless rendered him a proximate cause of the accident.

When the "the phrase 'proximate cause'" is reviewed as a "policy-based

judgment that not all factual causes contributing to an injury should be legally

cognizable causes," *Wagoner*, 756 S.E.2d at 175, the issue crystalizes:

1.  When the Virginia General Assembly declared it illegal for a driver to obstruct a highway so as to render it dangerous,

2.  mandated that a driver activate his emergency flashers when stopped, even temporarily,

3.  violation of each statute was negligence *per se*,

4.  the patent harm to be avoided by compliance with these statutory mandates was the injury or death of an unwary following driver, and

5.  the trial court, reviewing this evidence, determined that Mr. Harris's stopping and failure to activate his emergency flashers was the probable cause of Mr. Carter's death,

6.  is the Commonwealth's policy, under the facts here, served by treating deficiencies in the following driver's lookout, occasioned by his encounter with unexpected and unforeseeable obstructions to his travel, a proximate contributing cause, or a remote cause of the collision?

This issue may be resolved on policy grounds by certification of the question to the Virginia Supreme Court under Rule 5:40 of the Rules of the Supreme Court of Virginia, or resolved under the familiar requirement that before conduct can constitute the proximate cause of an outcome, the causal linkage must have been foreseeable by the actor charged.

**IV.  THE DISTRICT COURT ERRED WHEN IT CONSIDERED MR. CARTER'S CONTRIBUTORY NEGLIGENCE AS BEARING ON WHETHER MR. HARRIS ENGAGED IN WILLFUL AND WANTON MISCONDUCT.**

**A.  Standard of Review.**

Legal questions, including applications of law to facts, are reviewed de novo.  *Rawl*, 778 F.2d at 1014.

**B.  Analysis.**

The trial court erred by considering Mr. Carter's contributory negligence as a factor in determining whether Mr. Harris's conduct was willful and wanton.  A plaintiff's contributory negligence is only relevant if the defendant's conduct does not constitute willful and wanton negligence.  <u>See</u> *Clohessy*, 462 S.E.2d at 97 ("a defendant who is guilty of willful and wanton negligence cannot rely upon contributory negligence as a defense").  By failing to consider the defendant's conduct in total before assessing the plaintiff's conduct, the Court reached its decision by unintentionally weighing each parties' alleged negligent conduct.  For instance, when discussing Mr. Harris's knowledge as it pertains to willful and wanton negligence, the Court stated that Mr. Harris could not know that a car driven by someone who failed to keep a proper lookout would overtake him. (J.A. 975) ("Similarly, here, there is no evidence that Mr. Harris knew that a car would overtake him while he was stopped for twenty-five seconds on the interstate,

31

particularly a car driven by someone who failed to keep a proper lookout"). This is an impermissible analysis under Virginia law.

Whether Mr. Harris's conduct was willful and wanton should have been weighed independently from any conduct of Mr. Carter. See *Litchford*, 352 S.E.2d at 337 (the "negligence of the parties may not be compared . . ."). To prevent this type of procedural error, the Court should have first decided if the conduct of Mr. Harris was willful and wanton, and then, and only then, if it concluded Mr. Harris's conduct had not been willful and wanton, considered whether Mr. Carter was contributorily negligent.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court erred in entering judgment for the United States in this matter.  The Court should have held that Mr. Harris was guilty of willful and wanton negligence, Mr. Carter was not contributorily negligent, and Mr. Harris's conduct was the only proximate cause of the accident and Mr. Carter's death. Therefore, the Court should reverse the judgment of the district court in favor of the United States, enter judgment for Plaintiff, and remit the case to the district court for trial on Plaintiff's damages.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Fed R. App. P. 34(a)(1), Appellant-Plaintiff, by counsel,

respectfully requests permission to appear and present oral argument in this matter.

         Respectfully Submitted,

         ERA L. CARTER, as Executor and Personal
         Representative of the Estate of Floyd C.
         Carter, Jr., Deceased,

         By Counsel,

         /s/ Robert T. Hall_____
         Robert T. Hall (Virginia Bar No. 4826)
         Samantha K. Sledd (Virginia Bar No.82656)
         Hall & Sethi, P.L.C.
         12120 Sunset Hills Road, Suite 150
         Reston, Virginia 20190
         Telephone: (703) 925-9500
         Fax: (703) 925-9166
         E-mail: rthall@hallandsethi.com
         E-mail: sksledd@hallandsethi.com
         *Counsel for Appellant-Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*7,284*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>December 15, 2014          </u>          <u>/s/ Robert T. Hall          </u>
                                                                                           *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 15th day of December, 2014 I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Kent P. Porter
Virginia L. Van Valkenburg
OFFICE OF THE U.S. ATTORNEY
World Trade Center, Suite 8000
101 West Main Street
Norfolk, Virginia 23510
(757) 441-6331

*Counsel for Appellee*

I further certify that on this 15th day of December, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Robert T. Hall

*Counsel for Appellant*